# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **MARILYN JORDAN,** | ) |
| Plaintiff, | ) |
| v. | ) No. 05 C 2754 |
| **UNITED STATES POSTAL SERVICE** and **NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO,** | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This is an action under 39 U.S.C. § 1208(b) (2007) brought by plaintiff Marilyn Jordan ("Jordan") against her former employer, the United States Postal Service (the "Postal Service") and the union that represented her while she was so employed, the National Association of Letter Carriers, AFL-CIO ("NALC"). Her suit alleges the hybrid claim that the Postal Service unlawfully discharged her in violation of the collective bargaining agreement, and that NALC breached its statutory duty of fair representation. Jordan appears *pro se*. Both NALC and the Postal Service have filed motions for summary judgment. Jordan had until April 26, 2007 to file a response, but as of the date of this opinion she has not responded. For the following reasons, I grant NALC and the Postal Service's motions.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party meets this burden, the non-moving party must then go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Id.* at 694 (citing Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990)). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson*, 477 U.S. at 255. Additionally, here Jordan has not responded to NALC or the Postal Service's motion, and has not contested their Local Rule 56.1 statements of material fact or provided any additional facts in opposition to their motions. Therefore, under Local Rule 56.1(b)(3)(C),

defendants' statements of material fact are deemed admitted for purposes of ruling on their motions.[1]

Taking the facts, as set forth in defendants' statements of material fact and the exhibits thereto, in the light most favorable to Jordan, the following are the facts relevant to defendants' motions: Jordan was employed by the Postal Service from 1994 to 2004; she worked as a letter carrier. Jordan was last employed at the Postal Service's Moraine Valley Post Office in Bridgeview, Illinois. As a letter carrier, Jordan was a member of the NALC; NALC is the exclusive collective bargaining representative of city letter carriers employed by the Postal Service, and consequently served as Jordan's bargaining representative during her employment with the Postal Service.

NALC and the Postal Service have entered into a nationwide collective bargaining agreement, the "Agreement between United States Postal Service and National Association of Letter Carriers AFL-CIO" (the "CBA"). Article 15 of the CBA sets forth a multi-step grievance procedure. Under Informal Step A, if an individual employee feels aggrieved she may meet to discuss her grievance with her immediate supervisor within fourteen days of the date on which

---

[1] I note that the Postal Service's statement of material facts is in violation of Local Rule 56.1(a) because it contains more than 80 separately-numbered statements of undisputed material fact without prior leave of court to do so. As Jordan has not objected, and as the violation is minimal, I will not impose any sanction on the Postal Service for this violation.

she learned or may reasonably have been expected to have learned of the cause of her grievance. (Postal Serv. Ex. 2A, CBA Art. 15.1) NALC may similarly initiate Informal Step A. (*Id.*) At this step either the supervisor or a NALC representative has authority to resolve the grievance. (*Id.*) If the grievance is not resolved at Informal Step A, the CBA provides that NALC "shall be entitled to file a written appeal to Formal Step A." (*Id.*) During Formal Step A, "the grievant shall be represented for all purposes by a steward or a Union representative who shall have authority to resolve the grievance as a result of discussions or compromise" in Formal Step A. (*Id.* at Art. 15.2.) Under the CBA, "Any appeal from an unresolved case in Formal Step A shall be in writing to the Step B team at the appropriate Step B office." (*Id.*) The Step B team is instructed to "review the appeal and issue a joint report of the decision and any supporting findings." (*Id.*) The Step B team may "1) resolve the grievance 2) declare an impasse 3) hold the grievance pending resolution of a representative case or national interpretive case or 4) remand the grievance with specific instructions." (*Id.*) Further, "It is the responsibility of the Step B team to ensure that the facts and contentions of grievances are fully developed and considered, and resolve grievances jointly."[2] (*Id.*) Article 15.4 provides for arbitration if a

---

[2] The Postal Service and NALC have also promulgated the "USPS-NALC Joint Contract Administration Manual" (the "Manual") that the Postal Service asserts, without objection from Jordan, "provides

4

request for arbitration is submitted within the specified time limit for appeal. (*Id.* at Article 15.4.) According to the Postal Service and NALC's interpretation of Article 15.4, only impasses at the Step B level may be appealed to arbitration. (Postal Service Ex. 2B, Manual at 20.)

Between August 1, 2001 and April 30, 2005, Jim Ballou ("Ballou") served as the Step B Dispute Resolution Team Representative for NALC for the area that included grievances filed by NALC Local Branch 4016, the local NALC branch covering employees at the Moraine Valley Post Office. In his capacity as the Step B representative, Ballou reviewed all documents and written arguments provided to the Step B Team by NALC and management. Edward Miller ("Miller") served as the Step B Representative for the Postal Service.

In her deposition in this matter Jordan provided her account of the events surrounding her termination from the Post Office. She testified that on September 1, 2004, as she was working her

---

interpretive guidance of the CBA." The Manual states that the Step B decision team may decide to (1) resolve the grievance; (2) "Impasse the grievance if the team cannot resolve it;" (3) "Remand the grievance to the Step A parties with specific instructions;" or (4) "Hold the decision pending resolution of a representative case or national interpretive case." (Postal Service Ex. 2B, Manual at 16.) Also, according to the Manual "[a] resolved Step B decision may be a compromise settlement, a decision to uphold the grievance in its entirety, or a decision that there is no basis for the grievance." (*Id.*) At least one other court has recognized that the Manual provides interpretive guidance to the CBA. *See, e.g., Lavorgna v. Potter*, No. 05-1610, 2007 WL 1173675, at *6 (W.D. Pa. Apr. 18, 2007).

shift she felt tired and sleepy.  She notified Postmaster Paul Mokos ("Mokos") that she felt dizzy and fatigued, and he informed her that she could leave but that he needed medical documentation dated September 1, 2004, indicating how tired she was feeling that day.  Jordan left work around 10:30 or 11:00 and went to the office of Dr. Howard E. Sweeney ("Dr. Sweeney"), her physician.  His office was located in a building with other doctors' offices.  When she arrived at his office, it was closed, but she testified that she approached Dr. Sweeney's reception desk and told the nurse behind the desk that she needed to see Dr. Sweeney; the nurse told her that Dr. Sweeney was not in.[3]  According to Jordan, she told the nurse that she needed "some kind of medical documentation saying [she] was incapacitated."  Jordan then obtained a note on Dr. Sweeney's prescription pad dated September 1, 2004 (the "note"), that stated, "Mrs. Jordan was incapacitated for work today."  The note was not signed by anyone from Dr. Sweeney's office, although Jordan contends that the nurse at the desk gave her the note.  Jordan testified in her deposition that she is not sure that she can identify the person who provided the note to her, although she provided a general description of the person in her deposition.  Jordan returned to work on Friday, September 3, 2004, and gave the note to her supervisor.

---

[3]Jordan acknowledged in her deposition that the woman behind the desk did not identify herself as an employee of Dr. Sweeney.

6

On September 10, 2004, Jordan met with Mokos, a supervisor, and NALC union steward Bill Beaulieu ("Beaulieu") concerning the note. Mokos questioned the circumstances under which she obtained the note, and according to Jordan she told him that she saw a nurse and that Dr. Sweeney was not in that day. As a result of that meeting, Mokos placed Jordan on emergency placement in off-duty status. The next day, Jordan contacted Beaulieu and asked him to file a grievance about her emergency placement. NALC filed a grievance, and Ballou and Miller reviewed it at the Step B level with the resolution that the emergency placement be expunged from Jordan's records and that Jordan be compensated for lost wages.[4] According to Jordan's deposition, her claims in this case do not encompass the resolution of this grievance.

In a letter from Mokos dated September 29, 2004 (the "September 29 notice of removal"), the Postal Service notified Jordan that she would be removed from the Postal Service for the charge of "Unacceptable Conduct as Evidenced by Your Submission of A False Document to Secure Approved Leave." In the letter Mokos alleged that he was suspicious of the note Jordan provided to obtain leave, conducted his own investigation and determined that Dr. Sweeney was not in the office on September 1, 2004 and that no

---

[4]According to the written report of the decision, attached as Exhibit 6 to Jordan's deposition, the Step B team made this finding because "management failed to show reasonable cause" to place Jordan on emergency placement since the manager allowed her to work for three days after he discovered the allegations about her note.

7

one from his office had written the note.  He contended that when he questioned Jordan about the note on September 3, 2004, Jordan initially told him she had seen Dr. Sweeney, but then stated that she had seen his nurse, and later stated that she had seen someone but did not know who.  The letter cited several sections of the Employee and Labor Relations Manual ("ELM") that Jordan purportedly violated,[5] including

- 661.53, providing that no employee "will engage in criminal, dishonest, notoriously disgraceful or immoral conduct;"

- 511.43, providing that employees must "maintain their assigned schedule" and "must provide acceptable evidence when required;"

- 661.21, providing that all postal employees must "[p]ut loyalty to the highest moral principles and to country above loyalty to persons, party, or government department;"

- 666.2, providing that employees must "be honest, reliable, trustworthy, courteous, and of good character and reputation;"

---

[5]According to the Postal Service, ELM is the Postal Service's employee handbook and outlines the policies, rules and regulations that Postal employees are to follow.  Pursuant to Article 19 of the CBA:

> Those parts of all handbooks, manuals and published regulations of the Postal Service, that directly relate to wages, hours or working conditions, as they apply to employees covered by this Agreement . . . shall be continued in effect except that the Employer shall have the right to make changes that are not inconsistent with this Agreement and that are fair, reasonable, and equitable.

8

- 666.3, providing that employees must "uphold the policies of the Postal Service;"

- 666.81, requiring employees to be regular in attendance;

- 513.364, stating that when employees are required to submit medical documentation, it "should be furnished by the employees [sic] attending physician or other attending practitioner who is performing within the scope of his or her practice."

In addition, the letter noted that Jordan had previously received suspension or letters of discipline on four previous occasions.

After receiving the September 29 notice of removal, Jordan discussed it with Beaulieu who told her he would file a grievance on her behalf.[6] Beaulieu subsequently did so. Jordan asked Beaulieu to go to Dr. Sweeney's office and investigate who provided her with the note. He did so on two occasions and determined that neither Dr. Sweeney nor his staff were at his office on Wednesdays. His notes, which the Step B team later reviewed, indicate that he determined that Dr. Sweeney's offices are normally locked on Wednesdays, that he keeps his papers and stationary locked up in his office (although Beaulieu noted that he saw a prescription pad on the desk in the exam room), and that the other doctor at his shared desk does not "share" stationary with him. Jordan, Beaulieu, and a Postal Service representative then held a Step A meeting; her grievance was denied and then proceeded to the Step B dispute resolution team. Beaulieu told Jordan that certain issues

---

[6]Jordan also discussed it with NALC Union President Frank Kiefor.

9

would come up at Step B, including Jordan's note, statements from Dr. Sweeney's office, Jordan's previous typed statement regarding what happened, and Jordan's previous admission that she could not identify who wrote the note.

On November 4, 2004, the Step B team, Ballou and Miller, met to discuss Jordan's grievance. They reviewed documents provided by both NALC and the Postal Service management, including Beaulieu's notes of his investigation. Ballou reviewed five previous arbitration decisions in which arbitrators sustained the removal of grievants who submitted false medical documentation; in those arbitrations Ballou concluded that the arbitrators believed that submitting false medical documentation is so egregious as to warrant removal. After reviewing all of these documents, Ballou and Miller issued a written "Step B Decision" concluding that "management had just cause to issue the Notice of Removal" because "[t]he Postal Service must be able to trust that its employees will not engage in dishonest and fraudulent behavior" and that Jordan "ha[d] broke trust with the Postal Service and a removal is the appropriate action." The Step B team subsequently decided not to take Jordan's grievance to arbitration. The Postal Service sent Jordan a written notice dated November 5, 2004, informing her that her removal from employment was effective that same day.

Jordan subsequently filed her present complaint. In her complaint she alleges that although she was aware of ELM she did

not know that the note she brought in was not signed or needed to be signed as long as the note was on a doctor's letterhead. (Compl. at 3.) She alleges that she had an expectancy to remain in her job unless just cause for removal "per corrective/progressive discipline could be shown." (*Id.* at 7.) She alleges that the Postal Service acted unlawfully by disciplining her and not following Article XVI of the National Agreement, which she contends requires corrective/progressive discipline. (*Id.*) She further alleges that NALC acted in an arbitrary, discriminatory and bad faith manner by not going through arbitration, and that had they done so her grievance would have been resolved, or she would have only been issued discipline for a 14 or 21-day suspension and not lost her job. (*Id.* at 8.)

## II.

Jordan has brought the hybrid claim that the Postal Service unlawfully discharged her in violation of Article XVI of the collective bargaining agreement, and that NALC breached its statutory duty of fair representation in not going through arbitration.[7] To succeed, Jordan must show both; if her claim fails against either NALC or the Postal Service, it fails against both. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163-65

---

[7] 39 U.S.C. § 1208(b) is analogous to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), and courts construing hybrid claims under § 1208(b) have applied precedent from cases brought under § 185(a). *See, e.g., Roman v. United States Postal Service*, 821 F.2d 382, 388-90 (7th Cir. 1987).

(1983). Both NALC and the Postal Service contend that Jordan cannot show that NALC breached its duty of fair representation. I agree.

The Supreme Court has held that a union's duty of fair representation is the same as other fiduciary duties, and so just as other fiduciaries "owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75 (1991); *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992) (discussing holding of *O'Neill*). The test for whether NALC has met its duty of fair representation requires analyzing whether NALC acted arbitrarily, discriminatorily, or in bad faith. *Ooley*, 961 F.2d at 1302.

Addressing first whether NALC's failure to take Jordan's grievance to arbitration was arbitrary, the Supreme Court has concluded that the standard is extremely deferential, so that a union's actions are only arbitrary if they are "so far outside a 'wide range of reasonableness,'" that they rise to the level of irrational or arbitrary conduct. *O'Neill*, 499 U.S. at 78 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). The Seventh Circuit has stated, "Under this extremely deferential standard, courts should not substitute their judgment for that of the union,

even if, with the benefit of hindsight, it appears that the union could have made a better call." *Ooley*, 961 F.2d at 1302.

Here, taking the facts in the light most favorable to Jordan, NALC's actions clearly did not rise to the level of unreasonableness. Jordan's complaint does not contend that she should have received no discipline for the submission of an inadequate medical note, she simply argues that she should have received "progressive" discipline rather than being discharged. It is presumably this argument that she wishes NALC would have taken to arbitration.

Article XVI of the CBA provides that an discipline "should be corrective in nature, rather than punitive" and that no employee may be disciplined or discharged "except for just cause, such as, but not limited to . . . violation of the terms of this Agreement." (Postal Serv. Ex. 2A, CBA Art. 16.) The Manual explains that just cause "requires a fair and provable justification for discipline." (Postal Service Ex. 2B, Manual at 32.) It also explains that "just cause" has no rigid rules or precise definition, but that supervisors should take into account some basic considerations before initiating disciplinary action including (1) was there a rule that the employee was aware of; (2) is the rule reasonable; (3) is the rule consistently and equitably enforced; (4) was a thorough investigation completed; (5) was the severity of the discipline reasonably related to the infraction itself and in line with the

13

discipline usually administered and the seriousness of the employee's past record; and (6) was the disciplinary action taken in a timely manner. (*Id.* at pp. 32-33.)

In the written Step B decision, the Step B team, which included Ballou as the NALC representative, concluded that "falsification of medical documents is a violation of Postal Rules and regulations." (Postal Service Ex. 2F, Step B. Decision at 2.) It concluded that this rule was reasonable because the Postal Service had to be able to "trust that its employees will not engage in dishonest and fraudulent behavior." (*Id.*) On the face of its written opinion, the Step B team did not consider whether the rule was consistently and equitably enforced, whether there was a thorough investigation, and whether the disciplinary action was taken in a timely manner. However, the Step B team's written opinion does thoroughly summarize the evidence it considered, including the results of Ballou's investigation, and there is no argument from Jordan that disciplinary action was not taken in a timely manner (it was undertaken within a month after she submitted the note that the Postal Service believed was improper). Further, Ballou has submitted an affidavit, which Jordan has not refuted, that the Step B team reviewed previous arbitration decisions in which the arbitrator concluded that it was appropriate to discharge employees for falsifying medical documentation without engaging in other progressive discipline first because it calls into question

the trustworthiness of the employee. (Postal Service Ex. 2E at 39-105.)

I find that the reasoning of the Step B decision in which NALC participated demonstrates that NALC did not act arbitrarily in deciding not to take Jordan's case to arbitration. NALC reviewed the documentation that Jordan provided, and concluded that she could not show that Dr. Sweeney or someone from his office had written the medical note as Jordan claimed.[8] NALC also relied on previous arbitration decisions to conclude that the Postal Service could discharge Jordan for the first offense of this type without resorting to other lesser discipline first. NALC also reasonably concluded that employees should be aware of this rule. NALC's memorandum in support of its motion for summary judgment cites several cases in which courts have emphasized that unions have discretion in deciding whether to take an employee's grievance to arbitration. (NALC Memorandum at 7 (citing *Vaca v. Sipes*, 386 U.S. 171, 191 (1967); *Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1196 (7th Cir. 1990).) Even taking the facts in the light most

---

[8]Whether or not Jordan's claims concerning the circumstances in which she obtained the note are true is not the issue before me, but taking the facts in the light most favorable to Jordan it was at least reasonable and not arbitrary for NALC to conclude that Jordan lacked evidence to support her position, and that arbitration would have been unsuccessful. Jordan has also not pointed to any other information or arguments she would have wanted NALC to present on her behalf, so even taking the facts in the light most favorable to her there is no evidence that the outcome of arbitration would have been any different than the outcome at Step B.

15

favorable to Jordan, there is no evidence that NALC arbitrarily exercised its discretion not to pursue her grievance to arbitration in this case.

Under the analysis set forth in *Ooley*, I also must determine whether NALC acted discriminatorily or in bad faith. 961 F.2d at 1302. To be discriminatory, NALC's actions must be invidious, meaning they were based on impermissible distinctions such as race, sex, or political belief. *See, e.g.*, *Dole v. Commonwealth Edison*, No. 91 C 5913, 1992 WL 332300, at *6 (N.D. Ill. Nov. 6, 1992) (collecting cases). Here, even taking the facts in the light most favorable to Jordan, there is no evidence that NALC did not take her grievance to arbitration because of her race, sex, or for any reason other than that it did not believe her grievance was meritorious. Jordan herself has not even alleged that this is the case. Similarly, NALC's conduct was in "bad faith" only if there is "substantial evidence of fraud, deceitful action or dishonest conduct." *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 692 (7th Cir. 1982)(citation omitted). Here, taking the facts in the light most favorable to Jordan, there is no evidence that NALC acted fraudulently, deceitfully, or dishonestly in not taking her grievance to arbitration. Instead, the evidence is that NALC, through its Step B team representative, considered all of the evidence before it, including the Manual, precedent from other arbitration decisions and Jordan's admission that she did not know

16

who had signed her note, and determined that it had no basis to overturn the Postal Service's decision to remove her from her employment. Even if I do not agree with this decision, this is not a basis for me to find that NALC violated its duty of fair representation. *O'Neill*, 499 U.S. at 78 ("Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union."); *Ooley*, 961 F.2d at 1302.

III.

Because I find, taking the facts in the light most favorable to Jordan, that Jordan cannot show that NALC violated its duty of fair representation, Jordan's claim necessarily fails. I therefore need not consider whether the Postal Service violated its collective bargaining agreement. I grant summary judgment to both NALC and the Postal Service.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: May 29, 2007